**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **OSCEOLA WILLIAMS,<br>SUSAN CARTER and<br>OSCEOLA PERDUE, as Co-<br>Administrators of the Estate of<br>ALEXANDER McCLAY WILLIAMS,<br>Deceased,** | **CIVIL ACTION** |
| **Plaintiffs,** | **NO.  24-2132** |
| **v.** | |
| **JOSEPH RUTALA, ESQUIRE, as the<br>Administrator of the Estate of OLIVER N.<br>SMITH, Deceased, and as the<br>Administrator of the Estate of MICHAEL<br>TRESTRALL; MARK HALPERN, as<br>Administrator of the Estate of LOUIS A.<br>BLOOM, Deceased; and DELAWARE<br>COUNTY,** | |
| **Defendants.** | |

**HODGE, J.**                                                      **October 24, 2025**

## MEMORANDUM

As this Court has previously stated, this case arises out of tragic circumstances: a falsely accused child, police misconduct, coerced confessions, and the Commonwealth's undisputed wrongs. In 1931, Alexander McClay Williams ("Alexander"[1]), a sixteen-year-old Black boy, was wrongfully tried, convicted, and executed for the murder of a white woman. In 2022, due to tireless advocacy of the Williams family and the great-grandson of Alexander's trial attorney, Delaware County and the Governor of Pennsylvania acknowledged the horror of what had happened, and

---

[1] The Amended Complaint (ECF No. 25) and Motion to Dismiss (ECF No. 26) refer to Alexander McClay Williams as Alexander. The Court adopts this usage.

Alexander's conviction was vacated. Now, Alexander's estate (the "Estate") seeks damages for the constitutional violations he endured—as conceded by the Delaware County District Attorney—and the harm his family suffered as a result. The Estate has brought claims against Delaware County and three individual defendants (collectively "Defendants") for civil rights violations pursuant to 42 U.S.C. § 1983 and related state causes of action. Defendants now seek to dismiss Counts I and II (against all Defendants), Counts III, V, VIII, and XI (against the three individual defendants), and Count X against Delaware County. For the reasons that follow, Counts V and VIII are dismissed for failure to state a claim, and the Individual Defendants are entitled to qualified immunity for claims involving the Fourth Amendment and fabrication of evidence in Counts III and IV. The Motion is otherwise denied.

## I.    BACKGROUND

### A.    Factual Background[2]

On October 3, 1930, Vida Robare ("Robare") was fatally stabbed in her apartment at the Glen Mills School[3] in Delaware County. (ECF No. 25 at ¶ 28.) Robare was a 34-year-old woman who worked as a school matron at the Glen Mills School. (*Id.*) There were no witnesses to the stabbing, and no one was seen leaving the apartment building. (*Id.* ¶ 33.) Robare lived with her husband, Fred, and her ten-year-old son, Dale, in Cottage Five at the Glen Mills School, where

---

[2] The facts as pled in the Amended Complaint are the operative facts for the 12(b)(6) motion. The Court declines to consider Defendants' summary of the 1931 trial. While the Court may consider an undisputed authentic document that a defendant attaches as an exhibit to a 12(b)(6) motion if plaintiff's claims are based on the document, *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993); *Levins v. Healthcare Revenue Recovery Grp. LLC*, 902 F.3d 274, 279–80 (3d Cir. 2018), it is not necessary to consider the 1931 trial transcript at this stage. Further, given the Estate's allegations of false testimony at trial, the Court is reluctant and therefore will not consider the entire trial transcript as factually accurate.

[3] The Amended Complaint mistakenly identifies the school as the Glenn Mills School. The Court has corrected the spelling of the school to the Glen Mills School. *See, e.g.*, ECF Nos. 25-2, 25-3, 25-4 (identifying the school as the Glen Mills School).

forty-eight Glen Mills students also lived. (*Id.* ¶ 35.) The Glen Mills School housed 600 boys in total; these boys were referred to as "inmates." (*Id.*)

The murder prompted media attention. On October 4, 1930, the Chester Times quoted Chief County Detective Oliver Smith ("Smith") saying that the crime was committed by a strong, full-grown man, and that the victim was fit enough to have fought off a boy. (*Id.* ¶ 36.) Another witness stated that all 600 Glen Mills School students were accounted for at the time of the murder. (*Id.*) On October 7, the Chester Times quoted the District Attorney as saying that the murderer may have been a woman. (*Id.* ¶ 39.) Then, on October 10, the Chester Times reported that assistant district attorneys and detectives had decided to question Alexander, a Glen Mills Student. (*Id.* ¶ 40.) Alexander initially denied involvement in the murder, but over the course of at least five interrogations conducted over only a few days, each without an attorney or parent present, he confessed to the crime. (*Id.* ¶¶ 40–41; ECF No. 25-3 at 12–13.)[4] The newspaper wrote that Alexander made three separate confessions: twice on October 7, 1930, and again on October 9, 1930. (ECF No. 25 at ¶ 40.) It appears that as of October 7, 1930, the only suspect the district attorney was considering was Alexander. (*Id.* ¶ 50.)

The only evidence against Alexander was his confession; there was no physical evidence tying him to the murder. (*Id.*) Smith, Detective Michael Trestrall ("Trestrall"), and Assistant District Attorney Louis Bloom ("Bloom") were personally involved in the investigation of Alexander; Smith and Bloom also directly supervised investigative acts taken by detectives. (*Id.* ¶ 139.) Smith, Trestrall, and Bloom knew not only that they had no evidence to reasonably believe Alexander committed the crime (*id.* ¶ 42), but that there was no probable cause to arrest him or charge him with murder (*id.* ¶ 43). Additionally, the three men withheld from Alexander's counsel

---

[4] The Court adopts the pagination supplied by the CM/ECF docketing system.

all evidence of the circumstances of their interrogations of Alexander leading to his coerced, false confessions. (*Id.* ¶ 44.) Alexander's trial took place in January 1931. (*Id.* ¶ 45.) He was represented by William H. Ridley, Esq. ("Ridley"), the first African American lawyer to join the Delaware County Bar Association. (*Id.* ¶ 43.) During the trial, Trestrall falsely testified that Alexander had admitted to him that he kicked Robare in the ribs during the assault. (*Id.* ¶ 46.)

On January 7, 1931, Alexander was found guilty and sentenced to death. (*Id.* ¶ 47.) His attorney moved for a new trial, but the motion was denied. (*Id.* ¶ 48.) The Commonwealth of Pennsylvania executed Alexander on June 8, 1931 in the electric chair. (*Id.* ¶ 49.) Alexander's death certificate was altered so that his age was recorded as eighteen—an adult—rather than the sixteen-year-old child he actually was. (*Id.* ¶ 88.) Notably, Alexander remains the youngest person ever put to death in Pennsylvania. (ECF No. 25-2 at 2.)

Alexander's sister, Plaintiff Susie Carter, alongside Sam Lemon, Attorney Ridley's great-grandson, worked together to bring justice for Alexander. (ECF No. 25 at ¶ 76; ECF No. 25-2 at 5.) In 2017, Alexander's record was expunged. (ECF No. 25-2 at 4.) On June 13, 2022—ninety-one years after Alexander was put to death—the Delaware County Court of Common Pleas vacated his conviction. (ECF No. 25 at ¶ 77; ECF No. 25-1 at 2; ECF No. 25-2 at 2 ("[T]oday's decision is an acknowledgement that the charges against him should never have been brought.").) In a statement from the District Attorney's Office regarding their agreement to vacate the conviction of Alexander, the District Attorney was quoted as stating that "this young man was entitled to the protections of our Constitution, particularly the Fifth Amendment's protections against self-incrimination and the Sixth Amendment's right to counsel. We believe that this young man's constitutional protections were violated in an irreparable way." (ECF No. 25-2 at 4.)

On October 7, 2022, Pennsylvania Governor Tom Wolf issued a proclamation declaring that "Williams' due process rights were violated: he was interrogated by police without a lawyer or parent present, his confessions were inconsistent and likely coerced, and Vida Robare's death certificate was apparently doctored by authorities," acknowledging that "the conviction and execution of Alexander McClay Williams was an egregious miscarriage of justice," and apologizing to Susie Carter and the rest of Alexander's family. (ECF No. 25-4 at 1–2.) Alexander's family now seeks accountability for his death at the hands of the Commonwealth.

### B.    Procedural History

On May 17, 2024, the Estate of Alexander McClay Williams, via its co-administrators Susie Carter, Osceola Williams, and Osceola Perdue, filed their Complaint against Delaware County and Smith, Trestrall, and Bloom (the "Individual Defendants"): Joseph Rutala, Esq. is named as the administrator of the estates of Smith and Trestrall; Mark Halpern is named as administrator of the estate of Bloom. (ECF No. 1.) Defendants moved to dismiss the Complaint (ECF No. 7), which this Court granted in part and denied in part in May 2025 (ECF Nos. 22–23). The Estate then filed an Amended Complaint (ECF No. 25), which Defendants now move to dismiss. (ECF No. 26 ("Motion" or "Mot.").)

## II.    LEGAL STANDARD

In order to survive a motion to dismiss under Rule 12(b)(6) for failure to state a claim, a complaint must put forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This requires more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id*. at 678 (citation omitted). "To survive dismissal, 'a complaint must contain

sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Tatis v. Allied Interstate, LLC*, 882 F.3d 422, 426 (3d Cir. 2018) (quoting *Iqbal*, 556 U.S. at 678). Applying the principles of *Iqbal* and *Twombly*, the Third Circuit has articulated a three-part analysis to determine whether a complaint will survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6). *See Santiago v. Warminster Tp.*, 629 F.3d 121, 130 (3d Cir. 2010). This three-prong inquiry involves the following: "(1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011).

The pleading standard does not require a plaintiff to establish the elements of a prima facie case, but they must "put forth allegations that raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 213 (3d Cir. 2009) (internal citations omitted). "[C]onclusory or 'bare-bones' allegations will [not] survive a motion to dismiss." *Id*. at 210. "To prevent dismissal, all civil complaints must now set out 'sufficient factual matter' to show that the claim is facially plausible." *Id*.

## III.    DISCUSSION

In their Motion, Defendants raise four arguments: (1) the Estate is not a party entitled to bring claims under § 1983; (2) Counts I and II should be dismissed as being duplicative of other § 1983 claims; (3) Individual Defendants have qualified immunity for Counts III and XI, and other alleged constitutional violations are not, in fact, constitutional violations; and (4) Counts V and VIII fail to state a claim.

### A.    The Estate's Ability to Bring Claims under § 1983

The Court first addresses Defendants' argument that the Estate is not entitled to bring a claim under § 1983. All but one of the counts in the Amended Complaint, specifically Count XI, are brought under § 1983. Defendants cite a nine-page block quote from *Cariveau v. Callwood*, No. CV 3:24-29, 2025 WL 1135096 (D.V.I. Apr. 17, 2025) in arguing that the present case is a circumstance in which an estate should not be permitted to assert § 1983 claims because the deprivation of rights occurred a hundred years ago and none of the co-administrators of the Estate were alive at the time of Alexander's arrest. (Mot. at 26.) The plaintiff in *Cariveau*, similar to the Estate here, brought wrongful death and survival claims for a decedent's constitutional violations. Defendants, however, fail to note that the *Cariveau* court had previously disposed of the survival claim on statute of limitations grounds, and thus, the opinion only addressed the wrongful death claim. *See Cariveau*, 2025 WL 1135096, at *5 ("Lawyers may confuse the two claims following a death. The claims are not the same.").

It is well established that causes of action for violations of federal civil rights do not die with the victim of the constitutional wrong. *Baffa v. Black*, 481 F. Supp. 1083, 1085–86 (E.D. Pa. 1979). Wrongful death and survival actions are statutory creations that provide vehicles for estates to bring claims, including claims for constitutional violations under § 1983. *See id.* at 1086; *Moyer v. Berks Heim Nursing Home*, No. 13-cv-4497, 2014 WL 1096043, at *3–4 (E.D. Pa. Mar. 20, 2014); *Becker v. Carbon Cnty.*, 177 F. Supp. 3d 841, 854 (M.D. Pa. 2016). Under Pennsylvania law, an action to recover damages for a wrongful death may be brought by the estate to recover specific expenses including "reasonable hospital, nursing, medical, funeral expenses, and expenses of administration necessitated by reason of injuries causing death." 42 Pa. C.S.A. § 8301(d). As

such, a wrongful death cause of action asserts the rights of the estate rather than the decedent.[5] *See Alexander v. Fair Acres Geriatric Ctr.*, 678 F. Supp. 3d 639, 648 (E.D. Pa. 2023); *see also Massey v. Fair Acres Geriatric Ctr.*, 881 F. Supp. 2d 663, 670 (E.D. Pa. 2012) ("[the Pennsylvania Wrongful Death Statute] does not compensate the decedent—it compensates the survivors for damages which they have sustained as a result of the decedent's death.").

A survival action, on the other hand, allows an estate to pursue damages for injuries sustained by decedent during his life. *Moyer*, 2015 WL 1096043, at *4. The statute provides that "[a]ll causes of action . . . shall survive the death of the plaintiff." 42 Pa. C.S.A. § 8302. The survival act "authorizes a decedent's estate to assert claims that the decedent could have asserted had he lived." *Ewing v. Potkul*, 171 A.3d 10, 15 (Pa. Commw. Ct. 2017). The Estate therefore can properly bring actions for constitutional violations pursuant to the wrongful death and survival statutes.

### B. The Estate's Wrongful Death and Survival Claims

Defendants argue that the Estate's wrongful death and survival claims (Counts I and II) cannot be asserted as claims under § 1983 because they are not deprivations of constitutional rights. Rather, Defendants assert that "the Estate must plead a single survival count alleging a § 1983 claim for malicious prosecution, a survival count alleging a § 1983 claim for deprivation of liberty,

---

[5] The Wrongful Death Act provides that the decedent's spouse, children, or parents can recover damages, which includes the "present value of the services the deceased would have rendered to the family, had he or she lived." *Kiser v. Schulte*, 648 A.2d 1, 4 (Pa. 1993); 42 Pa. C.S.A. § 8301(b). The Estate is co-administered by Susie Carter and two nieces of the decedent, Osceola Carter and Osceola Perdue. (ECF No. 25 ¶¶ 15–18.) Because this case is brought by the Estate, and the co-administrators of the Estate do not include the specified beneficiaries in § 8301(b), the Estate's ability to recover under a wrongful death claim is limited to the expenses identified in the statute at § 8301(d). *See Miller v. Philadelphia Geriatric Ctr.*, 463 F.3d 266, 284 (3d Cir. 2006) (Smith, J., dissenting).

a wrongful death claim alleging a § 1983 claim for cruel and unusual punishment, et cetera." (Mot. at 26–27.)

Pennsylvania's Wrongful Death and Survival Act do not create independent causes of action, but rather they serve as vehicles through which legal claims can be asserted. *Cappel v. Aston Twp. Fire Dep't*, 693 F. Supp. 3d 467, 496 (E.D. Pa. 2023); *Donahue v. Borough of Collingdale*, 714 F. Supp. 3d 504, 508 n.7 (E.D. Pa. 2024). As discussed above, § 1983 claims can be properly brought by the Estate through these vehicles. The Estate therefore can maintain wrongful death and survival claims so long as it has a cognizable § 1983 claim. There should be no duplicative burden in discovery and motions practice that Defendants fear because these claims are intertwined. Furthermore, there is no risk of duplicative recovery because the Estate cannot recover, for example, under both a survival claim under § 1983 and a direct § 1983 claim for the same constitutional violation.

### C.    Qualified Immunity

Qualified immunity is an affirmative defense that is pled by a defendant government official sued in their individual capacity. Government officials performing discretionary functions are generally shielded from liability for civil damages. *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982). This immunity from liability is qualified—if an official knew or reasonably should have known that the action they took would violate the constitutional rights of a plaintiff, they are not entitled to immunity. *Id*. at 817–18. "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* at 818. A government official is not protected from suit or civil liability if their

conduct violates some clearly established statutory or constitutional right and a reasonable person would have known their conduct was unlawful. *Id.*

Courts apply a two-step approach in evaluating claims of qualified immunity. First, "a court must decide whether the facts that a plaintiff has shown make out a violation of a constitutional right." *Spady v. Bethlehem Area Sch. Dist.*, 800 F.3d 633, 637 (3d Cir. 2015) (internal quotations omitted). A plaintiff has "no duty to plead facts relevant to a qualified immunity defense in order to state a claim." *Thomas v. Indep. Twp.*, 463 F.3d 285, 292 (3d Cir. 2006), *abrogated on other grounds by Ashcroft v. Iqbal*, 556 U.S. 662 (2009) (citing *Gomez v. Toledo*, 446 U.S. 635, 639–40 (1980)). In *Gomez*, the Supreme Court stated unequivocally that "two—and only two—allegations are required in order to state a cause of action under [§ 1983]. First, the plaintiff must allege that some person has deprived him of a federal right. Second, he must allege that the person who has deprived him of that right acted under color of state or territorial law." 446 U.S. at 640. However, the Third Circuit noted in *Thomas* that the Rule 8 pleading standard may be insufficient for meeting the fact-specific inquiry required for analyzing a qualified immunity standard. 463 F.3d at 299. Accordingly, this Court gave the Estate leave to amend its complaint to provide additional facts to determine precisely what rights were violated and how. (ECF Nos. 22–23.)

Second, "the court must determine whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Spady*, 800 F.3d at 637 (internal citations omitted); *see also Penna v. City of Lancaster*, 690 F. Supp. 3d 494, 506 (E.D. Pa. 2023). The Individual Defendants have the burden to establish they are entitled to qualified immunity. *See E.D. v. Sharkey*, 928 F.3d 299, 306 (3d Cir. 2019). A defendant demonstrates they are entitled to qualified immunity "only if they can show that a reasonable person in their position at the relevant time could have believed, in light of clearly established law, that their conduct comported with

recognized legal standards." *Id.* "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

Defendants argue that the Estate fails to allege sufficient facts that Alexander's coerced confession was a constitutional violation. (Mot. at 17–18.) Even if sufficient facts were alleged regarding the coerced confession, Defendants argue that the Fourth Amendment had not yet been incorporated against the states at that time. (*Id.* at 18–19.) Defendants further argue that the Estate's additional constitutional violations are not protected by the Constitution: (1) "There is no constitutional requirement that law enforcement only question suspects after they obtain evidence that leads them to reasonably believe the suspect has committed a crime"; (2) "there is no constitutional requirement that law enforcement only question suspects on a single occasion"; and (3) *Brady v. Maryland*, 373 U.S. 83 (1963), was not applicable in 1931, and the Estate failed to explain what evidence was withheld. (Mot. at 20.) Defendants seek to dismiss Counts III and XI on grounds of qualified immunity. (ECF No. 26 at 1.) While not identified in the Motion or proposed order, Defendants' arguments that three additional constitutional violations are not protected by the Constitution relate to Counts III and IV.[6]

### 1.    Facts Alleging Constitutional Violations

In the Amended Complaint, the Estate alleges the following facts in support of constitutional violations caused by the Individual Defendants:

1.    Bloom[7] and Smith were both personally involved in the investigation of Alexander and directly supervised the investigative acts taken by the homicide detectives.

---

[6] Defendants do not address qualified immunity in connection with Counts V, VI, VII, VIII, or IX.
[7] The Estate's claims against Bloom are based solely on his investigatory actions and/or administrative actions, and not his duties as a prosecutor. (ECF No. 25 at ¶¶ 21–22.)

(ECF No. 25 at ¶¶ 34, 139.) Trestrall assisted in the investigation of the Robare murder (*id.* ¶ 34) and testified against Alexander at trial (*id.* ¶ 46.)

2. The Individual Defendants interrogated Alexander at least five times when they knew they had no evidence to reasonably believe that he committed the crime. (*Id.* ¶ 42.)

3. Each interrogation was conducted without an attorney or parent present on Alexander's behalf. (*Id.* ¶ 41.) The Individual Defendants isolated Alexander, failed to inform him of his rights, ignored his requests to have a lawyer present, interrogated him for hours, and verbally and physically abused him. (*Id.* ¶ 125.)

4. Through the interrogations, the Individual Defendants coerced Alexander into falsely confessing to committing the crime. (*Id.* ¶ 43.) His confession was later misrepresented as voluntary. (*Id.* ¶ 124.)

5. The Individual Defendants knew Alexander had no involvement in the crime and there was no probable cause to arrest or charge him with murder. (*Id.* ¶ 43.) The Individual Defendants, knowing that probable cause did not exist, intentionally caused Alexander to be arrested, charged, and prosecuted for the murder in violation of his constitutional right to be free of prosecution absent probable cause. (*Id.* ¶ 108.)

6. The Individual Defendants withheld from Alexander's counsel all evidence of the circumstances in which they obtained the coerced, false confessions. (*Id.* ¶ 44.) The Individual Defendants withheld fabricated, exculpatory and impeachment evidence. (*Id.*) The Individual Defendants withheld material evidence about Fred

Robare which deprived Alexander of his constitutional right to investigate an alternative suspect. (*Id.* ¶ 71.)

7.  Detective Trestrall testified that Alexander admitted to him that he kicked Robare in the ribs, and the Detective knew that his testimony was false. (*Id.* ¶ 46.)

8.  The Individual Defendants altered Robare's death certificate to state that Alexander killed her. (*Id.* ¶¶ 72–73.)

9.  The Individual Defendants conducted a constitutionally inadequate investigation, including without limitation by failing to fully investigate the alternative suspect Fred Robare. (*Id.* ¶ 116.)

The Estate has set forth sufficient facts that, taken together, allege violations of the Fourth, Fifth, and Fourteenth Amendments. While Defendants assert that Plaintiff is required to plead with more specificity because, for instance, the law clearly prohibits confessions obtained by threats, but the law permits police to offer false information to deceive a suspect into a confession, that analysis falls under the second prong of qualified immunity. *See Ziglar v. Abbasi*, 582 U.S. 120, 151 (2017); *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) ("The dispositive question is 'whether the violative nature of the *particular* conduct is clearly established.'") (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)).

Defendants' argument that the Estate's alleged violations in addition to coercion are not constitutional violations mischaracterizes and limits the allegations. The Estate does not allege a constitutional violation specifically for detectives questioning without evidence to reasonably believe the suspect committed a crime, nor that it is a constitutional violation to question a suspect more than once. Rather, they allege Alexander was interrogated at least five times, for several hours, without an attorney or parent present, during which he was verbally and physically abused,

without any evidence to reasonably believe that he committed the crime.[8] These facts sufficiently allege violations of the Fifth and Fourteenth Amendments.

Regarding the potential *Brady* claim, the Estate alleges that the Individual Defendants fabricated evidence and intentionally withheld and misrepresented exculpatory evidence. A claim for violation of due process rights to a fair trial caused by the detectives' deliberate deception is distinct from a *Brady* claim. *Dennis v. City of Philadelphia*, 19 F.4th 279, 290–91 (3d Cir. 2021). The deliberate deception that the Estate alleges against the Individual Defendants states sufficient facts to allege a constitutional violation separate from *Brady*.

### 2.    Clearly Established Rights at the Time of Defendants' Misconduct

Having established that the Estate sufficiently alleged violations of constitutional rights, the analysis turns to whether the right was clearly established at the time of the conduct. The investigation of Robare's murder occurred in October 1930. (*Id.* ¶ 40.) The constitutional right therefore must have been clearly established at that time. "A clearly established right is one that is so apparent that 'every reasonable official would understand that what he is doing is unlawful.'" *Dennis*, 19 F.4th at 288 (quoting *James v. N.J. State Police*, 957 F.3d 165, 169 (3d Cir. 2020)). However, it is not necessary that the specific action in question has previously been held unlawful. *Ziglar*, 582 U.S. at 151. Defendants assert that the Fourth Amendment right, the constitutional violations alleged regarding the number of interrogations without evidence, and the claim for due

---

[8] Defendants also assert that the Estate does not allege that Alexander requested an attorney during the interrogations. However, the Estate alleges that Alexander's requests for an attorney during the interrogation were ignored. (ECF No. 25 at ¶ 125.) Defendants similarly argue that the Amended Complaint does not allege physical beating in connection with the interrogation—apparently by conducting a keyword search solely for the word "beat" (ECF No. 28 at 2)—but the Amended Complaint alleges that Alexander was subject to verbal and physical abuse during the interrogations. (ECF No. 25 at ¶ 125.)

process rights to a fair trial caused by the detectives' deliberate deception—mischaracterized by Defendant as a *Brady* claim—were not clearly established constitutional violations in 1930.

Section 1983 is a landmark statute from the Civil Rights Act of 1871, which provides a right to sue officials who, under color of state law or custom, deprive another person of rights secured by the Constitution or federal law. It was enacted because many states enforced their own laws selectively and discriminatorily, and states did not adequately protect individual rights. *See* Brief for Constitutional Accountability Center as Amicus Curiae Supporting Petitioners, Williams v. Washington, 144 S. Ct. 679 (2024) (No. 23-191). The purpose of the Civil Rights Act of 1871, as plainly stated in the title, was "to Enforce the Provisions of the Fourteenth Amendment." *Id.* (citing 17 Stat. 13, 13 (Apr. 20, 1871)); *see also Monroe v. Pape*, 365 U.S. 167, 171 (1961), *overruled on other grounds by Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978) (discussing origins of § 1983).

Section 1983 provides a cause of action for the deprivation of rights secured by the U.S. Constitution or federal law. The constitutional right must be federally protected—thus, the violation of a clearly established right maintained under the Pennsylvania Constitution, for instance, cannot bring about liability under § 1983. *See Robinson v. Fair Acres Geriatric Ctr.*, 722 F. App'x 194, 197 (3d Cir. 2018); *Elkin v. Fauver*, 969 F.2d 48, 52 (3d Cir. 1992). To determine if the Individual Defendants violated a clearly established right, that right must have been under the U.S. Constitution or federal law, and that right must have been clearly established in 1930 when the alleged constitutional deprivations occurred.

The first eight Amendments to the U.S. Constitution initially applied only to the federal government and not to the states. *Barron v. City of Baltimore*, 32 U.S. 243 (1833); *Fox v. Ohio*, 46 U.S. 410 (1847); *Twitchell v. Pennsylvania*, 74 U.S. 321 (1868); *see also Twining v. State of*

*N.J.*, 211 U.S. 78, 99 (1908), *overruled by Malloy v. Hogan*, 378 U.S. 1 (1964) ("[I]t is possible that some of the personal rights safeguarded by the first eight Amendments against national action may also be safeguarded against state action, because a denial of them would be a denial of due process of law. If this is so, it is not because those rights are enumerated in the first eight Amendments, but because they are of such a nature that they are included in the conception of due process of law.") (internal citation omitted). In 1930, the Supreme Court had not yet incorporated the Fourth Amendment against the states. A state official in 1930 would therefore not reasonably or necessarily understand that their conduct as non-federal government officials could violate the Fourth Amendment. Thus, the Individual Defendants are entitled to qualified immunity for alleged violations of the Fourth Amendment. *See Weeks v. United States*, 232 U.S. 383, 398 (1914) (stating that the limitations on government conduct imposed by the Fourth Amendment "is not directed to individual misconduct of such officials. Its limitations reach the Federal government and its agencies"); *Wolf v. Colorado*, 338 U.S. 25, 27–28 (1949) (holding that the Fourteenth Amendment protects against "police incursion into privacy"); *Mapp v. Ohio*, 367 U.S. 643 (1961) (extending the exclusionary rule to the states).

But focusing merely on when the Supreme Court explicitly stated that a certain Amendment applied to the states would invite the Court to ignore the main inquiry which the Court will not do. While it is true that the process of incorporation of the Bill of Rights and subsequent Supreme Court case law both provide a much clearer picture of established rights in the modern era, that does not mean that rights could not have been clearly established in 1930. Whether a right is clearly established does not require that "there had been a precise preview of the applicable legal analysis underlying the defense." *Halsey v. Pfeiffer*, 750 F.3d 273, 295 (3d Cir. 2014). *See also Dennis*, 19 F.4th at 290 ("[M]ore general statements of the law are not inherently incapable of

giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful.") (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)).

What is relevant to this Court's inquiry is whether the rights that the Estate alleges were violated were "consistent with the fundamental principles of liberty and justice which lie at the base of all our civil and political institutions and not infrequently are designated as 'law of the land.' Those principles are applicable alike in all the states, and do not depend upon or vary with local legislation." *Herbert v. State of La.*, 272 U.S. 312, 316–17 (1926). This inquiry determines whether the right is protected under the Fourteenth Amendment, which was applicable to the states in 1930. *Scott v. McNeal*, 154 U.S. 34, 45 (1894); *Chicago, B. & Q.R. Co. v. City of Chicago*, 166 U.S. 226, 233–34 (1897). This is the same inquiry the Supreme Court engages in when determining whether an Amendment is incorporated against the states through the Fourteenth Amendment. *See, e.g.*, *Gitlow v. New York*, 268 U.S. 652, 665–66 (1925) (finding that freedom of the press is a fundamental right and liberty protected by the due process clause under the Fourteenth Amendment).

### a)  *Coerced Confession*

The common law dating back to 18th century courts of England recognized that "coerced confessions are inherently untrustworthy." *Dickerson v. United States*, 530 U.S. 428, 432–33 (2000). English courts excluded confessions that were not voluntary. *Id.* (citing *King v. Rudd*, 168 Eng. Rep. 160, 161, 164 (K.B. 1783); *King v. Warickshall*, 168 Eng. Rep. 234, 235 (K.B. 1783); *King v. Parratt*, 172 Eng. Rep. 829 (N.P. 1831)). In 1884, the U.S. Supreme Court addressed the delineation between a voluntary and involuntary confession, stating that the latter "deprive[s] him

17

of that freedom of will or self-control essential to make his confession voluntary within the meaning of the law." *Hopt v. Utah*, 110 U.S. 574, 584–85 (1884). The *Hopt* Court found the confession there should not be excluded because it was given within three minutes of questioning, and there was no suggestion of any threats or promises inducing the statement. *Id.* at 585.

The Supreme Court in *Brown v. State of Mississippi*, 297 U.S. 278 (1936) found that confessions obtained by coercion and brutality constitute a clear violation of the Fourteenth Amendment. *See also Hysler v. Florida*, 315 U.S. 411, 413 (1942) ("[O]ffensive to the Constitutional guarantees of liberty are confessions wrung from an accused by overpowering his will, whether through physical violence or more subtle forms of coercion commonly known as 'the third degree.'").

Subsequently, the Supreme Court has identified confessions elicited under conditions highly similar to Alexander's as a violation of the Fourteenth Amendment. *Haley v. Ohio*, 332 U.S. 596, 597–98 (1948).[9] The holding in *Haley* arose from a series of cases identifying conditions of interrogations that constitute Fourteenth Amendment violations. *See Chambers v. Florida*, 309 U.S. 227, 238–40 (1940); *White v. Texas*, 310 U.S. 530 (1940); *Ashcraft v. Tennessee*, 322 U.S. 143 (1944); *Malinski v. New York*, 324 U.S. 401 (1945). While these cases, as well as *Brown* and *Hysler*, postdate the alleged constitutional violations in this case, they stem from a historical understanding at common law that confessions made under onerous circumstances were questioned for voluntariness in court and could violate due process. The fact that subsequent case

---

[9] The interrogation of John Harvey Haley, a fifteen-year-old Black boy, lasted over five hours, involved several police officers questioning him, and occurred without a friend or counsel present for him. The Supreme Court explained: "What transpired would make us pause for careful inquiry if a mature man were involved. And when, as here, a mere child—an easy victim of the law—is before us, special care in scrutinizing the record must be used. Age 15 is a tender and difficult age for a boy of any race. . . . He needs counsel and support if he is not to become the victim first of fear, then of panic." 332 U.S. at 599–600.

law further defined what constitutes a voluntary confession in later times does not imply that the Individual Defendants would have considered their conduct lawful.[10]

Alexander, at just sixteen years old, was questioned for hours on at least five occasions. He was subject to verbal and physical abuse, and he was denied his request to have a lawyer present. The fundamental principles of liberty and justice since the common law in 18th century England have found coerced confessions such as these to violate due process. A reasonable official would have known this conduct was unlawful.

### b)    *Detectives' Deliberate Deception*

Separate from the coerced confession, the Estate alleges that the Individual Defendants violated Alexander's right to due process and to a fair trial under the Fourteenth Amendment by fabricating inculpatory evidence and deliberately using coercion and/or suggestion to obtain inculpatory witness statements in violation of constitutional rights. This alleged constitutional violation, as discussed above, is distinct from a *Brady* claim.

In *Halsey*, the Third Circuit rejected the defendants' argument that they were entitled to qualified immunity because that court had not held that fabrication of evidence violated the Fourteenth Amendment in 1985. The *Halsey* court found that such a right was clearly established by analogous case law. 750 F.3d at 295–97. In *Dennis*, the Third Circuit concluded that framing

---

[10] A 1930 Harvard Law Review Note discussed increased use of so-called third degree methods by police to extort confessions. Note, *The Third Degree*, 43 Harv. L. Rev. 617 (1930). The author found that police methods across the United States were shifting over the decade prior to 1930 from those in England—with new tactics including whipping, a mild use of the electric chair, forcing a suspect to stand in the morgue for an hour, solitary confinement, and more. *Id.* at 619. While five federal circuits declined to exclude evidence of confessions obtained through such coercive means, the Third Circuit did not address this question. *Id.* at 618 n.3. This shift could suggest an evolution in common law to finding such tactics not in violation of due process. However, there was no clearly established legal authority over Defendants in 1930 in the Third Circuit or Supreme Court allowing third degree methods to extort confessions.

criminal defendants through use of fabricated evidence "violates their constitutional rights [] with such obvious clarity that it is unreasonable for us to conclude anything other than that the detectives were on sufficient notice that their fabrication of evidence violated clearly established law." 19 F.4th at 290. In reaching this determination, the Third Circuit relied on *Mooney v. Holohan*, 294 U.S. 103, 112 (1935), which held that use of perjured testimony was "inconsistent with the rudimentary demands of justice as is the obtaining of a like result by intimidation" and thus violates the Fourteenth Amendment. The *Dennis* court also relied on *Pyle v. Kansas*, 317 U.S. 213, 216 (1942) which extended *Mooney*. In 1967, the Supreme Court stated that the Fourteenth Amendment "cannot tolerate a state criminal conviction obtained by the knowing use of false evidence" and that this principle has been established for more than 30 years. *Miller v. Pate*, 386 U.S. 1, 7 (1967).

Unlike the common law of coerced confessions, *Mooney* is not as clearly rooted in fundamental principles of liberty and justice. Rather, the *Mooney* Court compared obtaining a conviction through presentation of evidence known to be perjured to obtaining a conviction by intimidation, which is a violation of the Fourteenth Amendment. 294 U.S. at 112. While a right can be clearly established by analogous case law, the comparison here serves as an extension to a different type of conduct that results in the same constitutional violation. It is unclear whether there was a clear constitutional right against the use of fabricated evidence prior to *Mooney*, and thus, this ambiguity yields the conclusion that the Individual Defendants are entitled to qualified immunity for this violation.[11]

---

[11] Defendants' Motion does not argue that Trestrall is entitled to qualified immunity for false testimony. Thus, the Court's determination of qualified immunity does not apply to that allegation.

### 3.    Malicious Prosecution

Defendants state in their proposed order that Count XI should be dismissed because the Individual Defendants are entitled to qualified immunity. (ECF No. 26 at 1.) Count XI of the Amended Complaint is a state law claim for malicious prosecution.[12] Defendants' briefs contain no argument supporting qualified immunity for the allegations that the Individual Defendants "initiated or continued proceedings against Alexander, without probable cause, with malice or specific intent to injure." (ECF No. 25 ¶ 149.) Defendants therefore have not met their burden and are not entitled to qualified immunity.

It was well established by 1930 that "[p]rosecution of an innocent person, without using reasonable care to ascertain the facts, is not justifiable." *Emerson v. Cochran*, 4 A. 498, 501 (Pa. 1886). *See also id.* at 502 ("if the prosecutor has knowledge of facts which will explain the suspicious appearance, and exonerate the accused from a criminal charge, he cannot justify a prosecution by putting forth the prima facie circumstances, and excluding those within his knowledge which tend to prove innocence.")

Moreover, it is fundamental to our principles of liberty that "every person who puts the criminal law in force maliciously, and without any reasonable or probable cause, commits a wrongful act." *Wheeler v. Nesbitt*, 65 U.S. 544, 550 (1860); *see also id.* ("[I]t is unquestionably true that want of probable cause is evidence of malice."); *Brown v. Selfridge*, 224 U.S. 189, 191–92 (1912). The Fourteenth Amendment protected Alexander from this violation, and this right was clearly established. *See, e.g.*, *United States ex rel. Vajtauer v. Comm'r of Immigration*, 273 U.S. 103 (1927) (finding deportation on charges "unsupported by any evidence" as a denial of due process); *cf. Moore v. Dempsey*, 261 U.S. 86 (1923) (stating that constitutional rights are violated

---

[12] This Court has supplemental jurisdiction over the claim under 28 U.S.C. § 1367.

in state criminal prosecutions in which "the whole proceeding is a mask"). Probable cause is a foundational basis and prerequisite to a valid criminal arrest and to criminal jurisprudence. A reasonable law enforcement officer in the Individual Defendants' position could not have believed that they could proceed as they did with no probable cause to do so.

### D.    Whether Counts V and VIII State a Claim

#### 1.    Count V

The Estate alleges that the Individual Defendants violated Alexander's Eighth Amendment right by imposing the death penalty. Defendants argue that Count V fails because Defendants did not impose or carry out the death penalty, and there is no standalone claim for the imposition of the death penalty. (Mot. at 27.)

The Supreme Court stated that "[b]ecause the death penalty is the most severe punishment, the Eighth Amendment applies to it with special force." *Roper v. Simmons*, 543 U.S. 551, 568 (2005). In *Roper*, the Court held that the death penalty is a disproportionate punishment for offenders under the age of eighteen. The Supreme Court has applied the Eighth Amendment in other cases to assess the use of the death penalty itself, rather than merely the means by which the execution was caused. *See Thompson v. Oklahoma*, 487 U.S. 815 (1988) (holding that the execution of a person under the age of sixteen at the time of their offense violates the Eighth and Fourteenth Amendments); *Atkins v. Virginia*, 536 U.S. 304 (2002) (holding that executions of defendants with diminished mental capacity violates the Eighth Amendment). A standalone claim for imposition of the death penalty may therefore be stated.

However, the Amended Complaint does not address the connection between the Individual Defendants and the imposition of the death penalty. A defendant "cannot be held responsible for a constitutional violation which he or she neither participated in nor approved." *Baraka v.*

*McGreevey*, 481 F.3d 187, 210 (3d Cir. 2007) (quoting *C.H. ex rel. Z.H. v. Oliva*, 226 F.3d 198, 201 (3d Cir. 2000)); *see also Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988) ("Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence"). There are no allegations that the Individual Defendants sought the imposition of the death penalty or that they conducted the execution. While there is a nexus between the alleged conduct by Individual Defendants and ultimate imposition of the death penalty, no allegations show personal involvement by the Individual Defendants in that nexus. The Estate therefore fails to meet its burden of pleading that the Individual Defendants, acting under color of law, imposed this constitutional deprivation on Alexander. Thus, the Court dismisses Count V for failure to state a claim.

### 2.      Count VIII

Count VIII asserts that Individual Defendants violated the Fourth and Fourteenth Amendments by failing to intervene on behalf of Alexander to prevent his false arrest, malicious prosecution, false imprisonment, and deprivation of liberty and life without due process. (ECF No. 25 ¶ 133.) The Third Circuit has not recognized failure-to-intervene liability in the context of false arrests, neither at the time of the killing of Alexander in 1931 or now. *Lozano v. New Jersey*, 9 F.4th 239, n.4 (3d. Cir. 2021); *Ogrod v. City of Philadelphia*, 598 F. Supp. 3d 253, 273 (E.D. Pa. 2022). Thus, the Court dismisses Count VIII for failure to state a claim. *See Hughes v. City of Philadelphia*, No. CV 23-2186, 2023 WL 4852294 (E.D. Pa. July 28, 2023) (dismissing for failure to state a claim that the officer failed to intervene "to prevent [plaintiff's] false arrest, malicious prosecution, false imprisonment and deprivation of liberty without due process of law.").

**IV.    CONCLUSION**

For the foregoing reasons, Defendants' Motion to Dismiss is granted as to Counts V and VIII for failure to state a claim, and the Individual Defendants are entitled to qualified immunity for Count III as it relates to the Fourth Amendment and for Count IV as it relates to use of fabricated evidence at trial. As to all the other Counts enumerated in Defendant's Motion, the Motion to Dismiss is otherwise denied. An appropriate order follows.

**BY THE COURT:**

**/s/ Hon. Kelley B. Hodge**
_____

**HODGE, KELLEY B., J.**